```
 1           UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                   CHARLOTTE DIVISION

 3   UNITED STATES OF AMERICA     )
                                  )
 4                                )
                                  )
 5            vs.                 )   DOCKET NO. 3:22-cr-163
                                  )
 6                                )
                                  )
 7   KRISTI HEATHER KING,         )
                                  )
 8                                )
     Defendant.                   )
 9

10          TRANSCRIPT OF ELECTRONICALLY RECORDED
             ARRAIGNMENT AND DETENTION HEARINGS
11          BEFORE THE HONORABLE DAVID KEESLER
              UNITED STATES MAGISTRATE JUDGE
12                    JULY 11, 2022

13
     APPEARANCES:
14
     On Behalf of the Government:
15
         Stephanie Laboy Spaugh
16       United State's Attorney's Office
         227 W. Trade Street, Suite No. 1650
17       Charlotte, North Carolina  28202

18   On Behalf of the Defendant:

19       Peter Adolf
         Federal Defender's Office of Western North Carolina
20       129 West Trade Street, Suite 300
         Charlotte, North Carolina  28202
21

22
             Deborah Cohen-Rojas, C.S.R., R.D.R., C.R.R.
23                    Official Court Reporter
       Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
24   Proceedings stenographically transcribed via digital recording.

25
```

THE COURT: -- and this matter is charged by a Bill of Indictment. Today it's on for an arraignment and a detention hearing.

So, Mr. Adolf, first of all, is she prepared to be arraigned?

MR. ADOLF: She is, your Honor. She's received a copy of the Bill of Indictment and has reviewed it. We will waive any further reading, and I'd ask that a plea of not guilty and demand for a jury trial be entered on her behalf.

THE COURT: Very well. Madam Clerk, let's show, please, that we did proceed to arraignment today in Miss King's case. Mr. Adolf is here for her. Through him, the defendant waives a further reading of the bill. She enters a plea today of not guilty and requests trial by jury. That will constitute arraignment in the case, and we'll issue the usual orders to Mr. Adolf.

Also, as part of arraignment today, pursuant to the Due Process Protections Act, the Court does confirm the obligation of the Government to disclose to the defendant all exculpatory evidence in the case pursuant to Brady versus Maryland. The Court will order the Government to comply with that obligation. Failure to disclose exculpatory evidence in a timely manner could result in adverse consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, or other sanctions.

1     So that takes care of arraignment.  We'll move ahead now
2 to consideration of bond.  Does she wish to be heard on bond
3 today?
4          MR. ADOLF:  Yes, your Honor.
5          THE COURT:  All right.  Miss Spaugh.
6          MS. SPAUGH:  Thank you, your Honor.  We are asking for
7 detention.  The defendant is charged with sex trafficking of a
8 minor, and there is a presumption due to that charge that there
9 are no condition or combination of conditions that can
10 reasonably assure her appearance or the safety of the community
11 because of the offense.  She's facing, at the very least, 10
12 years of imprisonment all the way up to life for this charge.
13     Looking at the nature and circumstances of this offense,
14 the evidence shows that the defendant was arranging
15 commercial-sex transactions for the minor victim from mid-July
16 to September of 2021 and again briefly in December of 2021 in
17 Charlotte and Fort Mill.
18     The minor victim in this case was 15 years old at the time
19 and was reported missing at the end of June of 2021.  She
20 reported that the defendant's boyfriend would keep the cash
21 payments from customers, and the defendant would keep the Cash
22 App payments.
23     The investigation began on September 2nd of 2021.  The FBI
24 found commercial-sex advertisements on a Web site used for
25 commercial sex, skipthegames.com, depicting the minor victim

and offering her for commercial sex, so they conducted an operation to recover the victim on that day. An undercover contacted the number on the advertisement and set up an hour in-call at a hotel in Fort Mill, which is when a customer comes to the commercial sex provider at their location -- in this case, a hotel.

When the FBI arrived, they saw the defendant and her boyfriend sitting outside of the hotel entrance, and they saw the defendant using the cellphone during the same timeframe that the undercover was texting the advertisement number.

The undercover arrived to the room that he was given from the text, and in it he found the minor victim, also found condoms, and they sized two cell phones from the room that day. Once law enforcement overtly approached the car in the parking lot, the defendant and her boyfriend left the hotel.

While with the victim, law enforcement saw the name Heather King calling the victim's phone multiple times and then later saw the victim's phone receive FaceBook messages from Heather King saying, "Please let me know something." A hotel employee later reported to law enforcement that the defendant and another woman came back later that day to try and get a key for that room that the victim was found in.

Law enforcement continued to investigate and found commercial-sex advertisements depicting the minor victim from July through September of 2021. They obtained search warrants

for the victim and defendant's FaceBook accounts, where they found messages from mid-July to September showing that the defendant was arranging commercial-sex transactions with customers for the victim and then relaying the arrangement to the victim.

They also found that some customers would pay the defendant's Cash App account. For example, there are messages between the victim and the defendant from July 30th of 2021 where the victim asked what the defendant's Cash App is and she responded "mighty fine Heather 7715."

Later that day, the defendant told her, "It's a play coming, 60 for five minutes," which would be $60 for five minutes of time. A "play" is a term commonly used to refer to either commercial-sex customers or commercial-sex transactions.

There are messages from July 31st where the victim said that she wanted to take a break, she didn't have a play coming after this one, and asked the defendant if that was okay. About 30 minutes later, she told the defendant that her stomach hurt and she needed a pain pill. The defendant told her that she could chill after this for a little unless big money came through.

There are messages from the defendant on August 6th where she said, "Bring us the money real quick," and the minor victim reported that she would bring the defendant or the boyfriend the money, either after every transaction or every few

transactions.

There are messages from August 11th where the defendant sent the minor victim a room number and said to tidy up the room because she had plays lined up to come. In another message that day the minor victim mentioned that she was 16.

Later that day, the victim asked the defendant why she couldn't leave since they were okay with another girl leaving. Messages from July 28th show the victim asking the defendant how much this one is, and the defendant told her 100 QV. "QV" stands for "quick visit," which is a common term for 15 minutes of time in the commercial-sex world. The defendant asked if he's in there yet, and the minor victim asked her where the condoms were.

On July 31st, the defendant asked the minor victim if she was done, and the victim told her that "He's leaving now." The minor victim asked for the defendant's Cash App, and the defendant sent it to her. Later that day, the defendant told her a hundred QV, and the minor victim said, "He's going to be my fifth play today." The defendant said, "200 coming up," and she also told the minor victim that they were at Walmart getting what she needed.

On August 11th, the minor victim asked the defendant about going to stay with family for a week. The defendant essentially threatened to leave here her and told her that she wouldn't see them anymore if she went because they would go

back home.  She also told the minor victim that day that they risk a lot with her.

On August 16th, the defendant appeared to be in an argument with the victim.  She referred to the victim being her child's age and told her, "Watch who you talking to, you're talking big, we know everywhere you be."  And she said, "I don't argue with girls that's young enough to be my child," and that they had helped her out enough.  She also told the minor victim, "Girl, you are 16, runaway, and we changed you, and you got ahead of yourself."

At some point in August, the victim did leave to visit family in a different city.  Messages from September 1st show that the defendant and her boyfriend picked up the victim and brought her back to Fort Mill on that day.

Messages from September 2nd, which is the day that law enforcement recovered her, show that the defendant was setting up commercial-sex transactions for the minor victim and then relaying the amount of time and the price to the victim.

Law enforcement also reviewed text messages from the phone seized from the hotel room.  There are messages from July 19th where the defendant told the minor victim to send her the good pics of her.  The victim then sent her about 10 images of herself, and the defendant responded "body pic, too."  The victim then sent about 13 images of herself in a bra and underwear that appear to match some of the pictures posted in

her commercial-sex advertisements.  The defendant also told her to clean up her room and air it out because she had some plays coming.

On July 19th, the defendant messaged the minor victim and said, "And another one say they coming, just waiting to let me know how far he is, and this one is for 150."  She said, "The first guy coming in 80, then 150 if the other one come."  AT&T provided records in response to a subpoena showing that the subscriber of that phone number was the defendant.

There are messages in the defendant's FaceBook account from September 4th, which is two days after the FBI had rescued the victim.  A friend asked her how they lost their stuff, and the defendant responded, "She was a missing person, and she was only 15."  And she told her friend, "She told us she always 16."

On December 10th, the minor victim was reported as missing again.  Law enforcement recovered her Christmas morning at an apartment with others unrelated to this investigation.

While she was missing, on December 16th, they interviewed the defendant.  At that point in time they did not know where the victim was, so they were trying to just locate her.

The defendant told them she had not seen the victim recently and she didn't know that she had run away.  She claimed that she met the minor victim about two weeks before she was taken into custody by the FBI in September of 2021.

She said the victim initially told her she was 19 over the phone, but she said she was 18 when they met in person, and that she thought she was 17 or 18.  She claimed that she only found out the minor victim's real age after she was taken into custody.

She said that the three of them hung out for a while before the minor victim was posted in the commercial-sex advertisement, and, after about a week, the minor victim wanted to make money, and so she started posting advertisements for plays.  She said that the minor victim offered her money to the defendant's boyfriend and that it was his former girlfriend that was the one that was posting the commercial-sex advertisements of the victim.

She also said that she tried to tell the minor victim not to see plays and that she never directly received money from the minor victim's plays, but she paid for the hotel room that they shared.  She said she could only think of one time when a customer had paid through her Cash App account.

In the later interview, the minor victim reported to the FBI that in December she was with the defendant and her boyfriend until she had moved to the apartment that she was found at with others.  She estimated that she saw more than seven dates while with them at two different hotels in that short period of time in December.

The defendant's FaceBook messages from December 11th show

that she asked her boyfriend, "Have you even found someone with ID to get them a room?" And says, "This is too much stress on me, and you chilling at the Days Inn, and they just sitting in a room when they could be making money."

The next day, on December 12th, she told her boyfriend, "Try to get them a room while I'm at work." On the 13th, she said, "You can't even help me text, and I'm at work." And on the 16th, which is the day she was interviewed by the FBI, she said, "A play there," and he said, "Okay." She then said, "I can't keep stopping, they left because I can't stay on top of texting, it's too much, and I'm trying to do my job and missing money."

Law enforcement found the screenshots in her boyfriend's FaceBook of messages between them where she discussed with him her talk with the FBI when they were looking for the victim. She told him that the FBI had come to her job looking for the victim. She referred to her by name. She said that they thought she was with them, but she told them that they hadn't been around each other and that they hadn't been around the victim.

She said that the FBI told her about what the -- what the victim was saying about them and asked what they do for work and what she told them. And she also told him that they saw them leave out a parking lot, referring to that day in September.

There was another screenshot of their messages where she told him, "I just didn't want them to get you, so I stayed away, and the girl lied to us and really told them everything when she got locked up, and I got you and me out of it."

The victim has spoken to FBI law enforcement multiple times. She's reported that the defendant took some of her pictures used for commercial-sex advertisements and that the defendant posted some of her advertisements. She said that the defendant was always available and communicated with her when she had dates to make sure she was safe and that she usually kept the defendant updated.

She said that customers would sometimes pay through Cash App, and, when they did it, they sent it to the defendant's account and that the defendant would keep that money. She said the defendant or her boyfriend would buy her supplies, and the defendant bought her clothes. FaceBook messages corroborate that and show the defendant asking the victim on different dates what she needed.

The victim also reported that they would get two hotel rooms, one where she would sleep and share with the defendant and her boyfriend, and the other that she would use for the commercial-sex transactions. She also said that the defendant was the one bringing in girls to work.

Law enforcement also obtained MegaPersonal records, which is another Web site commonly used to post commercial-sex

advertisements, and that showed the victim's commercial-sex advertisements posted on that Web site, show that an account with the defendant's email -- that's also her registered email for her FaceBook -- posted advertisements of the victim on August 9th, 10th, and 11th, August 23rd through 25th, August 30th through 31st, and September 1st and 2nd of 2021.

Hotel records from the Sonesta Hotel in Charlotte from July 19th through the 21st show a room in the defendant's name. Law enforcement found commercial-sex advertisements of the minor victim from that day. Messages on one of the phones found in the room show that the unit of the phone sent that hotel address to a customer, and then they sent to the defendant's Cash App for payment.

Looking at the pretrial report, it shows a recent failure to appear from Georgia. It also shows that she was convicted in 2010 of assault and battery and that she has felony charges before that that were dismissed.

When the FBI was trying to arrest her for this warrant, they tried to meet with her the week before last and set up a meeting time, but she changed her mind and decided not to meet with them, so they went to her two places of employment, which was a hotel and a store.

The hotel said that she worked there until about the second week of June and then fired her because she continually failed to show up for work, and the store also reported that

she stopped showing up for work.

Looking at the pretrial report, she reported that she baby-sits for employment. She has an unknown start date, is obviously unstable. It's not appropriate for her to be around children and doesn't say how long she's been doing that.

She also has unstable housing. When the FBI arrested her, she said that she had been at that apartment for five or six days. Looking at the pretrial report, it says that she moved in July 1st, and the last name was unknown, is a friend that she was living with. There were children there when the defendant was arrested, inappropriate for her to be around any children with these charges.

She was living in a hotel before that. At least, that's what she told the FBI when they arrested her. And it also appears that she was living out of hotels during this crime and moving hotels frequently with the minor victim.

So the Government submits the evidence is strong that she is a danger, as well as a flight risk, and that she cannot overcome the presumption here, so we are asking that she be detained.

THE COURT: All right. Mr. Adolf.

MR. ADOLF: Judge, not to put too fine a point on it, but, when the prosecutor finally got to actually talking about what we're here for today, which is the characteristics and history of Miss King to see if the Court can release her on

conditions, I started a stopwatch, and I think we were still under a minute when they sat down.

So what we heard a whole lot about was about the case. We heard nothing about any kind of violent behavior or personal danger to small children or anything like that. What we heard was a whole bunch of stuff taken from cell phones, which -- where there's a boyfriend involved, who sounds like it's likely he's going to end up being the ring-leader when this all shakes out, and who was on what phone when, saying what, is going to be a major point of contention possibly. Maybe not. I have no idea what's going on with the boyfriend's case. I don't see him as a codefendant, at least from this indictment. So we don't know where that's going.

We did hear some stuff about the minor victim talking about how she was buying her clothes and making sure she was safe, so there's clearly different things going on among the three of them. And what that relationship is obviously will be a big factor going forward.

But skipping to the final minute of the prosecutor's presentation and actually talking about Miss King, you have somebody who does not have a single conviction worthy of consideration according to the Sentencing Commission. They did talk about a misdemeanor assault back in 2009 when she was 19. It says 30 days. I'd be curious to see if that was a suspended sentence or not. They sometimes miss those.

1     Since then, we have a couple of driving-without-a-license.
2  And this failure-to-appear that they started out with was --
3  what -- two weeks ago -- so -- on a traffic ticket in Georgia.
4  I don't even know -- I don't know how fast you go to traffic
5  court in Georgia, but, if -- if it's anything like here, it may
6  have been that she was already locked up by the time that
7  happened or who knows.  But to think that's indicative of
8  whether she's going to come back to court here, I think it
9  beggars belief.
10     The bottom line is she doesn't really have a record.  She
11 is local.  Her -- I -- I understand the -- I found the
12 probation's recommendation interesting because they recommend
13 detention, but they also said, in case the Court thinks
14 otherwise, they set out what they think appropriate conditions
15 would be.  It's a little unusual.
16     I think that they understand this may be different from
17 what we normally see in a sex trafficking or sex involving a
18 minor-type of charge, where there's no allegation of any kind
19 of hands-on abuse by a minor and nothing in the facts or in her
20 background to suggest that, while she's on bond, she presents
21 any immediate danger to children or anyone else.
22     I think the real issue is the fact that she's been
23 unstable residence-wise and is moving around from hotel to
24 hotel and so forth.  Her cousin is here in court today.  I just
25 talked to her before court, lives in Denver with her

```
 1  grandmother, which is Miss King's great-aunt, in the house that
 2  the great-aunt owns.  She is here in court supporting her and
 3  because they would be willing to provide a place for her
 4  Miss King to stay.  They're not planning on charging her
 5  anything.  She'd just help around the house.
 6       There are minor children in that household, as well.  They
 7  are ages 6, 4, and six months.  I asked the cousin if she's
 8  aware of what the charges are against her cousin.  She is.  I
 9  asked her if she has any hesitation about having her around her
10  children.  She said absolutely not.  She knows she's a good
11  person and so forth.
12       So at the end of the day, what we have is an indictment
13  charging a charge that is very serious.  The facts of it are a
14  lot more ambiguous and suggest that there is a relationship
15  going on where -- and just taking this from the prosecutor's
16  facts -- which I'm hearing for the first time, not in discovery
17  or anything like that -- you have a teenager who may or may not
18  have been already involved in this industry, portrayed herself
19  that way, portrayed herself at various times, at various ages,
20  where it was ambiguous whether she could do that or whether she
21  was of age or not in any sense.
22       And there was a relationship going on with Miss King and
23  her boyfriend where he may have been running the show, unclear
24  whose phones are what, but it is hardly a clear-cut case and
25  somebody who's a danger to children.
```

Particularly in the environment we're in, where jail space is so scarce, where there's so many difficulties with getting somebody to court and back -- I had a sentencing this afternoon in front of Judge Cogburn that just got canceled on Friday because of transport issues from Ocilla, where they are housing a lot of our folks. They're now housing them in Sparta, in south Georgia. I'm told that there are beds opening up at Butner where they're going to put pretrial detainees at some point. So I think jail is a scarce resource at this time, and forgetting all the health issues and everything else.

So I think the Court has to take a hard look beyond just the basic indictment and say, is this a person that I'm concerned about is going to commit new crimes while they're out on bond or disappear or be a danger to anybody? And I think it's -- it's totally clear that that's not.

Your Honor, can -- can put her on house arrest and whatever other conditions are available. Probations recommends sex-offender conditions if she is indeed released. Whether I think that's necessary or not is not really relevant, but that's something the Court has at its disposal.

I certainly think your Honor can release her to go live with her great-aunt and cousin and cousin's -- I guess, cousin's once-removed, at their family home in Denver. And she can stay there and probably won't have to leave the house much, if at all, and then will be back to court when she needs to be.

         THE COURT:  All right.  Thank you.
      Miss Spaugh, one question that sort of jumped out at me was the one that Mr. Adolf has raised.  Perhaps you can't speak to this, but I'm just curious why the boyfriend has not been charged.
         MS. SPAUGH:  I don't know if I can answer that, your Honor.
         THE COURT:  Okay.  All right.
      All right.  Well, here's what we'll do.  The -- the presumption of detention does arise from the charges.  The Government's forecast of the evidence is very serious.  The pretrial services report is somewhat unusual, but at least, in the first instance, recommends detention, although it certainly does offer an alternative.  But I do think detention is appropriate here, and so I will order that she be detained pending further proceedings.
         All right.  Thank you.
         (End of proceedings.)

C E R T I F I C A T E

I, DEBORAH COHEN-ROJAS, Federal Official Court Reporter for the United States District Court for the Western District of North Carolina, a Certified Shorthand Reporter, Registered Diplomate Reporter, and Certified Realtime Reporter, do hereby certify that the foregoing transcript is a true and correct transcript of the digitally-recorded proceedings transcribed under my direction.

Dated this 9th day of August, 2022.

_____
DEBORAH COHEN-ROJAS
CSR, RDR, CRR
Federal Official Court Reporter